IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HOLLY A. FLOERKE,

                        Plaintiff,                              OPINION AND ORDER

        v.                                                      17-cv-567-wmc

SSM HEALTH CARE PLAN,
and UNUM LIFE INS. CO. OF N. Am.,

                        Defendants.

        Plaintiff Holly Floerke brought suit against defendants SSM Health Care Plan ("Plan")

and Unum Life Insurance Company of North America ("Unum") under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.  Before the court are the

parties' cross-motions for summary judgment.  (Dkt. ##8, 16.)  For the reasons elaborated

below, defendants are entitled to summary judgment.


                              UNDISPUTED FACTS[1]

  **A. The Parties**

        Floerke, a resident of Baraboo, Wisconsin, was employed as a physical therapist by SSM

Health Care ("SSM") at St. Clare Hospital and Health Services between sometime in 2008

and July 25, 2014.  Beginning on January 1, 2009, Floerke became eligible to participate in the

Plan and to receive disability insurance coverage under a related insurance policy provided by

defendant Unum.  Unum also serves as the Plan's claims administrator for claims made by

SSM's employees.

---

[1] The following facts are material and undisputed for purposes of summary judgment,
except where noted below.

**B. The Plan**

Unum issued policy no. 351888-101, a group long-term disability policy to SSM effective July 1, 2014, for the benefit of its eligible employees ("the Policy"). The Plan is governed by ERISA as an employee disability welfare plan as is the Policy. (AR 599, 608.[2]) The Policy specifically explains to eligible employees that "you" are deemed

> disabled when Unum determines that:
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to **sickness or injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury; and
> - during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the material and substantial duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(AR 612 (emphasis original).) The Policy also details how benefits will be paid out:

> *60% OPTION*
>
> 1. Multiply your monthly earnings by 60%.
> 2. The maximum monthly benefit is $10,000.
> 3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your **gross disability payment**.
> 4. Subtract from your gross disability payment any **deductible sources of income**.

(AR 612-13 (emphasis original).)[3]

---

[2] Throughout this opinion, the court will cite to portions of the claim file as "AR __."

[3] The Policy defines "deductible sources of income" to include "[t]he amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under: The United States Social Security Act[,] The Canada Pension Plan[,] The Quebec Pension

Particularly material here, the Policy further puts limits on the payment period: "Disabilities, due to sickness or injury, which are primarily based on **self-reported symptoms**, and disabilities due to **mental illness** have a limited pay period up to 12 months." (AR 618 (emphasis original).) The Policy adds that "Unum will not pay beyond the limited pay period as indicated above or the maximum period of payment, whichever occurs first." (*Id.*)[4] "Self-reported symptoms" are defined by the Policy as

> manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

(AR 626.) The Policy defines "mental illness" as "psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment." (AR 624.)

Finally, the Policy provides that "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (AR 608.) "Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan," with the limitation that these "determinations must be reasonable and based on the terms of the Plan and the facts and

_____

Plan[, or] any similar plan or act." (AR 615.

[4] The Policy set forth two possible exceptions to the 12-month limitation, but they are not relevant here. (*See* AR 618.)

circumstances of each claim." (AR 632-33.)

## C. Floerke's Condition

On March 18, 2014, Floerke complained about two-weeks of non-menstrual headaches that would not respond to over-the-counter NSAIDs.[5] As a result, Floerke's family doctor, Elizabeth Matera, prescribed anti-migraine medications.[6] Instead of improving the headaches, however, those prescriptions caused Floerke to develop a shoulder muscle spasm. On March 21, Dr. Matera then performed an occipital nerve block, which also proved unsuccessful.

Drs. Matera and Swallen, the attending physician, subsequently diagnosed Floerke with migraines and prescribed Sumatriptan, which did not help. Floerke was then referred to neurology, who recommended a brain MRI and CT, but those, too, were inconclusive. After an exam showed that Floerke's upper trapezius and paracervical musculature were tender, she was then given a steroid taper without success. Further testing also ruled out vasculitis (inflamed blood vessels),[7] an infection, hydrocephalus or a mass. Her EEG and ophthalmology exam were similarly normal, although Floerke did report tingling throughout her body and tenderness in her upper trapezius, and in April 2014, physician assistant Kristi Trybek noted reduced sensation to temperature and pinprick, as well as tenderness in Floerke's temples and occiput. (AR 871.)

---

[5] The parties agree that prior to 2014, Floerke suffered from depression, anxiety and pre-menstrual headaches. Defendants dispute plaintiff's assertion that these problems were controlled. (Pl.'s Reply to Defs.' Resp. to Pl.'s PFOF (dkt. #26) ¶¶ 9-10.)

[6] While the parties agree that Dr. Matera prescribed the migraine medications, they disagree about whether Floerke made her initial complaint to Matera or another doctor. (*See* Pl.'s Reply to Defs.' Resp. to Pl.'s PFOF (dkt. #26) ¶¶ 11-12.) This dispute is not material.

[7] *See* Vasculitis, *Mayo Clinic* (Oct. 18, 2017), https://www.mayoclinic.org/diseases-conditions/vasculitis/symptoms-causes/syc-20363435.

Floerke began seeing Dr. Phillip Bain and Jennifer Nale PA-C at the Dean Health Headache Clinic in July 2014. By then, her migraines lasted for hours at a time and were bilateral, causing light and sound sensitivity, nausea and vomiting. Still, Nale and neurologist Dr. Frucht reported a normal neurological examination. Continuing to treat Floerke throughout the summer, the Dean Health Headache Clinic identified some medications that countered her migraines, resulting in a period when she was headache-free.

Unfortunately, this relief was temporary. After Floerke's migraines returned, she then tried a Botox treatment, which also failed. As a result, Dr. Bain authorized a thirty-day medical leave on July 23, although Floerke continued working until July 25. By August, Floerke reported being "absolutely miserable," restricted in her activities and had stopped driving. Even with these restrictions, she rated her migraine pain as usually being 7-8 out of 10.

With no solution in hand, Dr. Bain then referred Floerke to the Michigan Headache and Neurological Institute ("MHNI"), where she was seen and admitted in September 2014. At MHNI, Floerke recounted her symptoms and migraine history, and she was first examined by Dr. Arnaldo Neves Da Silva, who diagnosed Floerke with "chronic daily persistent headaches." Another doctor at MHNI, Dr. Shamas Moheyuddin, similarly found that Floerke had "chronic cervicalgia," "chronic daily persistent headache with a strong cervicogenic component," "high pressure syndrome," and "cervical spondylosis." (AR 119.) On exam, Floerke had moderately tender C2-C3 facets, a limited range of motion, and occipital tenderness.

During her time at MHNI, Floerke also underwent a number of procedures. She had two diagnostic lumbar punctures, which revealed high opening pressures. She next had C2-C3 facet block injections, which confirmed diagnoses of cervicogenic headaches and cervical

spondylosis. She further received injections of the dorsal root ganglion, which confirmed diagnoses of C2 radiculopathy and cervicogenic headaches, as well as assigned diagnostic codes for migraine and brachial neuritis or radiculitis.[8] Neither of these procedures provided lasting relief, nor did Floerke report improvement generally during her hospitalization at MHNI.

Finally, Lisa Ensfield, a MHNI psychologist, made five mental health diagnoses: (1) "possible psychological factors affecting a medical condition with avoidant features"; (2) "major depressive disorder, recurrent, moderate"; (3) "history of panic disorder, in partial remission due to effective medication"; (4) "other specified anxiety disorder, with obsessive features"; and (5) "possible hypersomnolence disorder." (AR 139.) Relatedly, Ensfield recorded that: "The patient endorsed current depressive symptoms related to head pain. She indicated that she had suicidal thoughts associated with head pain at the end of June 2014. . . . The patient also acknowledged current anxious symptoms related to head pain as well as a history of panic." (*Id.*) Ensfield also noted that Floerke "plans to secure a local psychiatrist and psychotherapist, . . . denied formalizing a return to work plan, . . . indicated that her short term disability was about to expire and that she planned to file for long term disability." (AR 138.)

At discharge, MHNI concluded that Floerke had intractable migraine, as well as possible Depo-Provera aggravated headache and benign intracranial hypertension. Dr. Saper, MHNI's director, further noted that: (1) Floerke's "MRI of the C-spine without contrast showed no evidence of high grade spinal canal or foraminal narrowing in the cervical spine"; (2) her April 2014 brain MRI "was unremarkable, including views of the light trigeminal nerve" (AR 136-

---

[8] The parties disagree about whether any of the diagnoses were solely made post-procedure. The medical record reflects that they were both pre- and post-procedure diagnoses. (*See* AR 116-17, 1009.) However, there appears no reasonable dispute that the procedures were confirmatory.

37); and (3) her occipital nerve was tender on neurological exam. Saper recognized that Floerke had "psychological comorbidities," but noted that MHNI did not think that they were a barrier to improvement. (AR 997.) Her discharge notes explain that "[o]besity and the inflammatory response to obesity indicated by the sed rate elevation may be important. No other markers are available that would indicate a secondary cause of headache at this time." (AR 134.)

Following discharge from MHNI, Floerke returned to Dr. Bain, who noted (1) the "lumbar puncture pressure" findings and (2) her symptoms remained unchanged. On October 28, 2014, Bain also noted that Floerke had "no significant improvement" while at MHNI. (AR 342.) At that time, Bain listed her comorbidities as "[d]epression, [a]nxiety and [o]besity," which were considered "[c]hronic/stable but significant." (*Id.*) Floerke was given a Botox injection that day and instructed to return in 12 weeks.

On January 20, 2015, Floerke was seen by Mary Hamburg, APNP, who noted that her migraines continued, as well as the possibility that they were related to spinal fluid-caused pressure. Bain treated Floerke with a series of Sphenopalatine Ganglion blockades, but like most treatments, they were unsuccessful in treating her headaches, even temporarily.

Floerke received other medical procedures in 2015. First, she had a sleep study in early 2015, after which she began using a CPAP machine. Second, she needed a laparoscopic cholecystectomy in April because of acute cholecystitis. Third, and also in April, she had surgery after fracturing her ankle. In September 2015, Floerke complained about worsening pain with certain postures. She also reported being unable to clean the tub, empty the dishwasher or vacuum, as well as complained of sensitivity to light and sound. In November 2015, Dr. Bain's treatment notes further reflect that he was "not sure what else [he] ha[d] to offer [patient regarding] her disabling headache pain." (AR 687.) Bain then referred her to

another pain center.

In late 2015, a pain management specialist at the Pain Care Center, Dr. Thomas Faull, saw Floerke. During his exam, Dr. Faull found that Floerke "really has only minimal tenderness in the left upper cervical region as well as multiple tender points in the upper thoracic, including the trapezius," but that he could not "find a cervicogenic component." (AR 714.) Faull further noted Floerke's "PHQ-9 score today is 19. This would suggest a moderately severe level of functional impairment secondary to depression. Pain Disability Index scored 40/70 today. This would suggest moderate disability related to pain." (AR 713.) Faull also found that Floerke had "coexisting anxiety and depression," with her depression being considered "moderately severe." (AR 714.) Faull then added that "unfortunately, [the clinic did not] have a procedure that would likely be of benefit," but he "[w]ould like her to see pain psychology for evaluation and treatment." (*Id.*) Specifically, Dr. Faull recommended plaintiff see "pain psychology for cognitive behavior therapy, improved coping skills, progressive relaxation, biofeedback and self hypnosis," as well as "physical therapy, specifically aquatherapy for general conditioning and strengthening." (*Id.*)

### D. Short- and Long-Term Benefits Approvals

Plaintiff's claim for medical leave and short-term disability benefits began with a phone call to Unum on July 25, 2014. Unum next received a short-term disability attending physician statement from Dr. Bain on Floerke's behalf on August 9. In this statement, Bain: (1) identified her primary diagnosis of chronic migraines; and (2) noted that he had advised Floerke to stop working for a month on July 23. (AR 77.) In response, Unum requested plaintiff's medical records from Bain's office. Those records related to her short-term disability claim, while

confirming that she was seeking treatment for "worsening" headaches that caused her to miss work. Bain submitted another statement on August 19, noting "Chronic daily headache" as the primary diagnosis, and her being "unable to work due to chronic headache." (AR 92-93.)

Floerke received short-term disability benefits, which lasted for the maximum period, ending on October 24, 2014. She then applied for long-term disability benefits on November 11, 2014. Moreover, Unum initially approved Floerke for long-term benefits on December 19, 2014. However, in the letter approving Floerke's request, Unum explained that:

> The policy provided by your employer limits your benefits to 12 months due to your medical condition of chronic headaches and/or depression/anxiety disorders. This means that if your medical records continue to support that you are unable to return to work due to these conditions, you will remain eligible to receive benefits for a maximum of 12 months based on these conditions. This period will end on October 24, 2015.
>
> Please keep us informed about any other medical conditions we should consider in our review of your claim. This would include physical conditions that also impact your ability to work. If you continue to meet the definition of disability because of other physical conditions you may be eligible to receive additional benefits beyond October 24, 2015.

(AR 202.)

Unum called Floerke in June 2015 to discuss her ankle injury and her headaches. During the call, Floerke also discussed her most recent Botox injection on May 28, 2015, and that she had been instructed to follow-up with Dr. Bain in three months.[9]

In January 2016, Floerke submitted a form and a physician statement from Dr. Bain to Unum as an update about her disability status. Dr. Bain opined that "Chronic daily headache"

---

[9] Dr. Daniel Trotter submitted an attending physician statement to Unum concerning her ankle injury, and he opined that Floerke could not "work due to surgery and recovery time for healing." (AR 297.) This statement did not reference Floerke's headaches.

was Floerke's *primary* diagnosis and "anxiety" was her *secondary* diagnosis, explaining that she "has severe refractory chronic migraine headaches. She cannot work in any gainful employment due to severe refractory pain that has not responded to any of our therapeutic options." (AR 591.) He also noted that her depression and anxiety were "significant comorbid conditions." (*Id.*) A few months earlier, Bain had similarly described Floerke's headache condition as "Severely disabling." (AR 455.) Floerke also submitted a letter by Peter Laubach, MSSW LCSW, who wrote confirming her diagnoses of: "Persistent Depressive Disorder with periods of Major Depressive episodes" and "Major Depressive Disorder, moderate to serious intensity and with anxious features," as well as adding a diagnosis of post-traumatic stress disorder caused by her migraines. Similarly, Laubach identified her depressive symptoms as hypersomnia, diminished motivation, poor energy levels, irritability, tearfulness, suicidal ideation with plan, and periods of hopelessness. He opined that the headaches had worsened Floerke's depression and that her depression made it harder for her to treat her headaches. He based these opinions on two office visits. Finally, he found that her PTSD significantly worsened her anxiety. (AR 644-45.)

In February 2016, Unum had senior clinical consultant, nurse Judith Ellington, perform a clinical review of Floerke's claim to "determine if the condition for which the insured is seeking disability benefits is verifiable using tests, procedures or clinical examination standardly accepted in the practice of medicine." (AR 742.) Ellington concluded that it was not, explaining that even "[f]ollowing extensive diagnostic studies, consultations with exams by various providers, trials of multiple medications and procedures, no etiology of the chronic daily headaches compounded by chronic migraines has been determined and no significant response to any therapy has been evidenced." (AR 746.) She explained:

[n]o etiology for the chronic headaches has been determined. MRI of cervical spine was reported in 2014 as being normal. Dr. Faull, pain management, 12/21/15, opined that cervicogenic component was not found; exam reflected only minimal tenderness in left cervical region as well as multiple tender points in upper thoracic spine.

(*Id.*) Ellington also identified "major depressive disorder requiring management via Lexapro since 2005 and morbid obesity" as the "most significant" comorbidities. (AR 754.)

### E. Termination of Benefits

On March 1, 2016, Unum notified Floerke that it had terminated her long-term disability benefits under the "Self-Reported Symptoms/Mental Health" provision of the Policy, but Unum would nevertheless provide an additional payment equaling three months' of long-term disability benefits "as a customer service to you."[10] Floerke contacted Unum's office after receiving the letter. Unum employee Kristi Moore's notes of that phone call indicate:

[Floerke] asked even though she has a doctor corroborating that she has symptoms. I explained that the question is not of disability. It's that the policy has the limitation. There is no testing or a way to verify symptoms, so it's deemed self-reported symptoms.

---

[10] Specifically, Unum informed Floerke that:

Your policy has a limitation for disabilities due to a mental illness and disabilities based primarily on self-reported symptoms. Based on the information we have on file, you are limited to a maximum of 12 months of benefits. Your benefits started on October 25, 2014 for your condition and symptoms of chronic migraines, chronic daily headaches and depression. Because your claim is subject to this limitation and we have now provided more than 12 months of benefits, we will stop paying benefits on your claim as of March 02, 2016. . . . Administratively we have agreed to issue an additional payment equal to 3 months of benefits as a customer service to you.

(AR 759.)

(AR 766.)

During this same time frame, Floerke had also sought and received Social Security Disability Income benefits. Unum requested that claim file, but only received it after discontinuing Floerke's long-term disability benefits. Even though plaintiff still had time to appeal its termination decision, Unum preemptively reviewed the file to see if Social Security's decision to grant Floerke's claim impacted its decision to discontinue benefits. On May 16, 2016, Unum informed Floerke that the information in her SSDI claim file did not alter its prior decision:

> The file indicates you were approved with a primary diagnosis of Major Depressive Disorder and a secondary diagnosis of Migraine. Our decision differs from the Social Security Administration for the following reason:
>
> Our decision is based on a provision of the policy which limits the duration of benefits for disabilities due to mental illness and based on self-reported symptoms to 12 months. Your disability is subject to this limitation. Because you received 12 months of benefits, this limit was reached and no further benefits are available.

(AR 1469.)

On August 25, 2016, Floerke filed a timely administrative appeal from Unum's termination of long-term benefits, seeking the reinstatement.[11] Floerke later submitted a "narrative report" from Dr. Bain, dated October 27, 2016, in which he opined that Floerke met the criteria for chronic migraine under the International Classification of Headache Disorders, 3rd Edition (the "ICHD-3"). Specifically, Bain noted Floerke had a persistent headache that lasted for more than three months, had a "[d]istinct and clearly-remembered

---

[11] In September and October, Unum agreed to extend the time for Floerke to submit additional information.

onset, with pain becoming continuous and unremitting within 24 hr" and was "[n]ot better accounted for by another ICHD-3 diagnosis." (AR 3064.) Dr. Bain explained that

> The diagnoses of chronic migraine and new persistent daily headache are primarily made by history and physical ruling out other conditions. Imaging procedures such as MRI and CT scan rule out other types of headaches. The 2 types of headaches noted above are generally considered diagnoses of exclusion. She has had MRI, MRA of brain and CT scan of brain. No other causes of her headaches were identified.

(AR 3065.) On the basis of exclusion, therefore, Dr. Bain opined that Floerke's headaches prevented her from seeking or being gainfully employed.

Internally, Unum assigned Floerke's appeal to a senior clinical consultant, nurse Elizabeth Israel, for review. Nurse Israel, an appeals specialist, was not involved in addressing Floerke's original claim. She reviewed Floerke's file to determine if "the medical information support[ed] any restrictions/limitations that would prevent the insured from performing full-time sustained function" while "[e]xcluding mental illness and self-reported symptoms, but considering all other conditions, as of 3/2/16 and ongoing." (AR 3083.) Israel concluded that it did not:

> [N]o identified etiology has been determined to explain her chromic daily headaches compounded by chronic migraines despite extensive evaluations and diagnostic studies and her treatment has been symptom driven. Neuro imaging and lab workup has been negative for concerning etiologies such as a brain mass, hydrocephalus, vasculitis, and infection.
>
> This insured's headaches have persisted since 3/3/14 despite preventive medications, steroids, IV abortive therapies, OTC preventatives . . ., physical therapy, with records consistently documenting 'no cause found or useful treatments,' 'the pain has not responded to any of the treatments tried so far,' and 'headaches remain constant. No treatments have been effective.' As documented by Dr. Frucht . . . "With her workup being mostly complete, I do not have a good explanation for the patient's symptoms."

> Neurological examinations have been consistently unremarkable,
> nonfocal, and . . . normal.

(*Id.*)  Israel added that Floerke did not receive work restrictions or limitations for any of her

physical conditions, including GERD, morbid obesity, obstructive sleep apnea, and allergic

rhinitis, finding instead that "her treatment has consisted of medical management."  (AR

3084.)

Unum issued its appeal review decision on December 5, 2016.  Concluding that "the

decision on Ms. Floerke's claim is correct," the decision stated that:  "[t]he Benefits Center

determined Ms. Floerke is able to perform the duties of her regular occupation.  She is no

longer disabled according to the policy and further benefits are not payable." (AR 3091.)  The

decision explains:

> After analyzing the medical data, our Appeals clinical consultant
> concluded that no identified etiology has been determined to
> explain [Floerke's] chronic daily headaches and migraines despite
> an extensive evaluation and diagnostic studies.  Treatment has
> been symptom driven.  There is no support for a physical organic
> based condition causing your client's ongoing reported headaches.
>
> Therefore, we have determined that her headaches/migraines fall
> within the policy's 12-month self-reported symptoms benefit
> period limitation as they are not verifiable using tests, procedures
> or clinical examinations standardly accepted in the practice of
> medicine.  Her behavioral health condition is also encompassed
> within this combined policy benefit period limitation and no
> further benefits are payable for either self-reported symptoms
> and/or mental illness.

(AR 3094-95.)  Floerke filed suit in this court on July 24, 2017, seeking reinstatement of

benefits and attorneys' fees under ERISA.


OPINION

The parties agree that Unum, as the plan administrator, was granted discretion.  (*See*

Defs.' Opening Br. (dkt. #9) 19; Pl.'s Opening Br. (dkt. #18) 12; *see also* AR 608, 632-33.)

Where an administrator is granted discretion in determining benefits, the court relies on the arbitrary-and-capricious standard to review the administrator's decision. *See Hennen v. Metropolitan Life Ins. Co.*, -- F.3d --, No. 17-3080, 2018 WL 4376994, at *5 (7th Cir. Sept. 14, 2018) (citing *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013)). The arbitrary-and-capricious standard "is deferential but 'not a rubber stamp,'" such that the court "will not uphold a termination when there is an absence of reasoning in the record to support it." *Id.* (quoting *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)). Accordingly, an administrator's decision will be upheld

> as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

*Id.* (quoting *Thompkins*, 712 F.3d at 999). Unsurprisingly, given that explanation, this is generally considered "the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Trombetta v. Cragin Fed'l Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996) (citing *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)).[12] Put another way, the arbitrary-and-capricious standard permits reversal where "a decision is 'downright unreasonable.'" *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)).

As the Seventh Circuit has explained, however, "downright unreasonable" does not

---

[12] *Trombetta* did not involve a disability insurance claim, but rather claims of entitlement to participation in an employee stock ownership plan governed by ERISA. 102 F.3d at 1436-37.

mean that a plaintiff must "show that only a person who had lost complete touch with reality would have denied benefits," but instead it is used "merely [as] a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary duties." *Holmstrom*, 615 F.3d at 766 n.5. Moreover, where the administrator also serves as the Plan's payment obligor, that obvious conflict of interest is appropriately considered as a factor in determining if the administrator abused its discretion. *Hennen*, 2018 WL 4376994 at *5 (internal citations omitted). Even so, "the standard of review remains the same." *Jenkins*, 564 F.3d at 861 (internal citation omitted). The conflict-of-interest factor acts "as a tiebreaker when the other factors are closely balanced" in favor of capriciousness. *Id.* at 861-62 (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).[13]

Defendants argue that "[b]ecause Unum's decision [to discontinue benefits based on the Policy's 12-month limitation period for self-reported symptoms and mental illness] was reasonable and supported by the administrative record," it "must be upheld and the present motion for summary judgment granted." (Defs.' Opening Br. (dkt. #9) 1.) In support of their motion for summary judgment, defendants raise three arguments, all of which plaintiff disputes. The court will address each argument in turn.

## A. Self-Reported Symptoms Limitation

First, defendants argue that Unum's application of the self-reported symptoms limitation "was reasoned and informed" by plaintiff's medical records, which reveal that her

---

[13] While the Seventh Circuit in *Jenkins* explained how a conflict-of-interest could be used as a tiebreaker, it did not do so there because it was not a "borderline case[]"; instead, the plan administrator's "determination simply [could]n't be branded as arbitrary and capricious." 564 F.3d at 862.

own doctors "were unable to verify the etiology or cause of her reported chronic headaches" making her diagnoses of "chronic migraine" and "new persistent daily headaches" primarily based on plaintiff's self-reported symptoms. (*Id.* at 20, 22.) Plaintiff disagrees, contending that Unum's application of the self-reported symptoms limitation was an abuse of discretion because her diagnoses were "*primarily* based on her history, physical exam and a process of exclusion . . . diagnosed through standard clinical practice." (Pl.'s Opp'n (dkt. #20) 7-8.) Plaintiff explains that the "systematic diagnosis, following medically accepted standards, puts Floerke's chronic migraines outside the Self-Reported Symptoms Limitation." (Pl.'s Opening Br. (dkt. #18) 17.) Plaintiff further argues that "Unum ignores a contrary body of evidence -- Floerke did have positive test findings that were linked to and verified the existence of her headaches." (Pl.'s Opp'n (dkt. #20) 8.) She contends that her doctors "diagnosed cervicogenic headaches by looking at objective evidence -- increased spinal pressure, tenderness and range of motion" such that her disability "falls outside the scope of the self-reported symptoms limitation" because "[e]ach of these tests, on their own, were sufficient to verify Floerke's disabling headaches." (Pl.'s Opening Br. (dkt. #18) 16.)

Tellingly, both parties point to *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323 (7th Cir. 2011), for support. In that case, the Seventh Circuit explained that "the self-reported symptoms limitation applies to disabling illnesses or injuries that are *diagnosed* primarily based on self-reported symptoms rather than to all illnesses or injuries for which the *disabling symptoms are self-reported.*" *Id.* at 330. Other courts agree that "the self-reported limitation applies only to the method used to diagnose the sickness or injury that led to [the] disability claim, and not the symptoms of the claimed disability itself." *Cox v. Allin Corp. Plan*, 70 F. Supp. 3d 1040, 1054-55 (N.D. Cal. 2014) (collecting cases) (finding application of the self-reported symptoms

limitation was unreasonable because plaintiff's vertigo was verified through the Dix-Hallpike maneuver). After interpreting the self-reported symptom limitation, *Weitzenkamp* considered "whether the diagnosis of disabling fibromyalgia . . . was based primarily on [plaintiff's] self-reported symptoms or on objective medical evidence," concluding that fibromyalgia was "not primarily based on self-reported symptoms" as it can be diagnosed based on "the verifiable evidence of its manifestations" -- the trigger test. 661 F.3d at 331.

Here, however, plaintiff's chronic migraine and new persistent daily headache diagnoses *are* based primarily on self-reported symptoms, making them subject to the self-reported symptom limitation as interpreted by *Weitzenkamp*. Dr. Bain explained that plaintiff met the criteria for chronic migraine under the ICHD-3, namely a persistent headache that: (1) lasted for at least three months; (2) had a distinct onset, with (3) pain becoming unremitting and continuous within 24 hours; and (4) was not better accounted for in the ICHD-3. Only plaintiff could provide information to satisfy the first three criteria. Likewise, Bain added that plaintiff's "diagnoses of chronic migraine and new persistent daily headache are primarily made by history and physical ruling out [of] other conditions." (AR 3065.) Plaintiff's contention that the diagnoses were made under "medically-accepted standards" (Pl.'s Opening Br. (dkt. #18) 17) is not enough to prevent application of the self-reported symptoms limitation. *See Hilton v. Unum Life Ins. Co. of Am.*, 967 F. Supp. 2d 1114, 1123 (E.D. Va. 2013) (affirming application of self-reported symptoms limitation to migraines); *Huberts v. ATA Holdings Corp Welfare Benefit Plan*, No. 1:07-cv-287-RLY-WTL, 2008 WL 687127, at *5, *7 (S.D. Ind. Mar. 10, 2008) (affirming application of the "self-reported symptoms" limitation to plaintiff's headaches because the headaches were "for the most part, incapable of clinical verification"

and "headaches" was listed as a "self-reported symptom").[14]

In an attempt to avoid this result, plaintiff points to two possible physical symptoms of her headaches noted in the medical records -- her high pressure readings and cervicogenic tenderness -- as objective evidence. While her medical records note that her "continuous migraine . . . is felt [to be] related to increased pressure of her spinal fluid" (AR 929), that is not a complete picture. At other times her pressure was described as "not impressive," "marginal," and "[h]igh normal." (AR 925, 1672-73.) Further, one record even notes that "[i]t is possible that [her pressure] is too high for her . . . but we do not have any support for that at this point." (AR 1005.) Accordingly, her spinal fluid pressure does not appear to be verifiable evidence confirming her headaches.

As to the cervicogenic headaches diagnosis, plaintiff's medical records are conflicting. Yes, her records reveal that diagnosis, but another treatment provider noted "only minimal tenderness in the left upper cervical region," an inability to "find a cervicogenic component." (AR 714.) Likewise, her cervicogenic pain -- which itself is self-reported -- does not appear to be verifiable evidence of her headaches. *Cf. Cox*, 70 F. Supp. 3d at 1055-56 ("The self-reported symptoms limitation does not require a definitive diagnosis. It only requires that *the presence of the condition is verified*. In other words, although the cause of the vertigo may not be known, the fact that Plaintiff suffers from vertigo has been verified by physicians." (emphasis added)).

---

[14] The court recognizes that both *Hilton* and *Huberts* predate *Weitzenkamp*, and they arguably apply a different standard. *See Hilton*, 967 F. Supp. 2d at 1122-23 ("The issue is not whether the *diagnosis* of migraines is verifiable using tests and procedures, but rather whether the *manifestations* themselves -- the headaches -- are verifiable using tests and procedures."); *Huberts*, 2008 WL 687127, at *4 ("[T]he question that must be answered now is whether his disability is 'primarily based on self-reported symptoms.'"). However, in the case of headaches or migraines, the symptoms and the diagnoses appear interchangeable. Further, in *Huberts*, plaintiff's headaches may have been partially clinically confirmed by ptosis (eye drooping) that accompanied a specific type of headache.

For these reasons, the court simply cannot say that Unum abused its discretion in applying the self-reported symptoms limitation to plaintiff's migraines and headaches. The policy expressly limits benefits for this type of claim, and Unum did not abuse its discretion in applying that policy. That is not to say that this is a satisfying result. While the Seventh Circuit has "rejected as arbitrary an administrator's requirement that a claimant prove her condition with objective data where no definitive objective test exists for the condition or its severity," *Holmstrom*, 615 F.3d at 769 (citations omitted), *some* (albeit not all) migraines *can* be verified by objective evidence, *see* Mark W. Weatherall, *The Diagnosis and Treatment of Chronic Migraine*, 6 Therapeutic Advances in Chronic Disease 115, 116 (2015).[15]

The court hastens to add that this decision is not to denigrate plaintiff's diagnoses of chronic migraines and persistent headaches, nor of their debilitating effects. Far from it, since under other circumstances -- though perhaps not here -- these same self-reported symptoms may make her eligible for social security benefits.[16] Instead, the question is whether Unum was contractually bound to find her eligible for benefits beyond twelve months, given the negotiated exclusion for disabilities primarily based on self-reported symptoms. Draconian as it may seem, Unum's decision is arguably consistent with the actuarial calculations it made at the time of contracting to provide insurance, and in that respect was as much a decision by her

---

[15] Of course, *Holmstrom* is also factually distinguishable: (1) that plaintiff had a number of surgeries, which can be relevant to assessing allegations of pain, *see Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 646 (7th Cir. 2007) (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)); (2) she demonstrated cognitive impairment; (3) the plan administrator moved the evidentiary target during the course of the administrative review; (4) the plan improperly failed to consider plaintiff's social security benefits; and (5) the challenged termination of benefits did not occur under a self-reported symptoms limitation, but rather under a broader plan definition of disability.

[16] The Social Security Administration awarded plaintiff benefits with a primary diagnosis of major depressive disorder and a secondary diagnosis of migraine. (*See* AR 1442, 1469.) It is unclear whether her claim would have been approved with only the migraine diagnosis.

employer, as by Unum.

### B. Mental Illness Limitation

As "an additional basis" for affirmance, defendants contend that Unum's application of the mental illness limitation "was neither arbitrary nor capricious," because plaintiff's doctors "consistently identified the interplay between and comorbidity of [her] headaches and mental illnesses." (Defs.' Opening Br. (dkt. #9) 24-25.) Plaintiff responds arguing that "nothing in the record . . . indicate[s] that [her] disability was caused by a mental health impairment and not her physical condition," noting that "Unum's consultants agreed that Floerke is disabled by headaches." (Pl.'s Opp'n (dkt. #20) 10.) Because the court has already concluded that Unum did not abuse its discretion by applying the self-reported symptoms limitation, the role of the mental illness limitation is moot. Nevertheless, given the attention paid to it by the parties, the court will briefly address this argument as well.

Unum's application of the mental illness limitation was also not an abuse of discretion. Multiple treatment providers addressed plaintiff's mental health. MHNI's psychologist, Lisa Enfield, diagnosed plaintiff with "major depressive disorder, recurrent, moderate" and noted that plaintiff "endorsed current depressive symptoms related to head pain." (AR 139.) Pain management specialist Dr. Thomas Faull considered plaintiff's depression to be "moderately severe," noting that her PHQ-9 score "suggest[ed] a moderately severe level of functional impairment secondary to depression." (AR 713-14.) Dr. Bain, while opining that plaintiff's headaches were her primary diagnosis, called her depression and anxiety "significant comorbid conditions." (AR 591.) Social worker Peter Laubach also identified depressive disorders, opining that plaintiff's depression was worsened by her headaches. (AR 644-45.)

Further, Unum referenced or relied on the mental illness limitation throughout its correspondence with plaintiff. Plaintiff's approval for long-term disability was based on her "medical conditions of chronic headaches and/or depression/anxiety disorders," and she was advised that the applicable policy "limits [her] benefits to 12 months due to [her] medical condition of chronic headaches and/or depression/anxiety disorders." (AR 202.) In the termination letter, Unum explained that the "benefits started on October 25, 2014 for [her] condition and symptoms of chronic migraines, chronic daily headaches and depression" and that its termination decision was "based on a provision of the policy which limits the duration of benefits for disabilities due to mental illness and based on self-reported symptoms to 12 months." (AR 759.) Explaining the appeal decision, Unum noted that the Social Security Administration awarded plaintiff benefits "with a primary diagnosis of major depressive disorder and a secondary diagnosis of migraine," adding that both "fall under th[e] 12 month benefit period limitation." (AR 3095.) Unum explained, "we can no longer pay benefits as we have determined [plaintiff] has been paid the maximum benefits allowed for mental illness and/or self-reported symptoms." (*Id.*) Accordingly, the court cannot find Unum's application of the mental illness limitation to be an abuse of discretion on this record.

### C. Unum's Internal Review

Finally, defendants argue that Unum's discontinuation of plaintiff's benefits was "supported by Unum's consulting clinicians," who performed detailed reviews of plaintiff's medical records. (Defs.' Opening Br. (dkt. #9) 25-26.) In particular, defendants point to the reviews of Nurses Ellington and Israel. Ellington found that plaintiff's headaches were not "verifiable using tests, procedures or clinical examination standardly accepted in the practice

of medicine" (AR 746), while Israel concluded that "[e]xcluding mental illness and self-reported symptoms, but considering all other conditions, as of 3/2/16 and ongoing, the medical information d[id] not support any restrictions/limitations that would prevent the insured from performing full-time sustained function" (AR 3083). Plaintiff contends that defendants cannot rely on the opinions of these reviewers because they "opine[d] on whether there is an established etiology for [her] symptoms," instead of determining if her "symptoms are objectively verifiable." (Pl.'s Opp'n (dkt. #20) 11.)

As addressed above, Unum's application of the self-reported symptoms limitation was not an abuse of discretion. Likewise, Unum's reliance on the nurses' analyses in reaching that conclusion was not an abuse of discretion. Nurse Ellington was specifically charged with determining if plaintiff's condition was "verifiable," and she concluded that it was not. (AR 746.) Nurse Israel, on the other hand, was instructed to exclude self-reported symptoms and mental illness in determining whether plaintiff would be prevented from "full-time sustained function." (AR 3083.) She also concluded that the answer to that question was "no." (*Id.*) Their opinions about a lack of etiology are not enough to make Unum's reliance an abuse of discretion.

Accordingly, because Unum did not abuse its discretion in applying the self-reported symptoms or the mental illness limitation, nor in relying on the review of its internal experts, its decision to terminate plaintiff's benefits must be affirmed.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #8) is GRANTED.

2) Plaintiff's motion for summary judgment (dkt. #16) is DENIED.

3) The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 17th day of October, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge